**REEVE ALEUTIAN AIRWAYS, INC., Appellant,**

v.

**UNITED STATES of America, et al., Appellees.**

No. 91–5242.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 13, 1992.

Decided Jan. 22, 1993.

As Amended March 26, 1993.

Bertram W. Rein, with whom Philip J. Davis, Washington, D.C., was on the brief, for appellant.

Richard N. Reback, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellees.

Before WALD, D.H. GINSBURG and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Reeve Aleutian Airways, Inc. ("Reeve") appeals a decision of the district court rejecting its claim that the procedures the Commercial Airlift Review Board ("CARB") employed in suspending Reeve from the military airlift transportation program violated the Due Process Clause of the Fifth Amendment. Reeve claims that CARB failed to provide it with two core elements of due process—adequate notice and a meaningful hearing. More specifically, Reeve alleges that CARB's allusion to a lengthy Federal Aviation Administration ("FAA") report on Reeve's operations provided insufficient notice of which items in the report formed the basis for the proposed suspension and that CARB's pre-suspension hearing did not allow Reeve the opportunity to confront its accusers in any meaningful way. We find that Reeve was given sufficiently specific notice to prepare an adequate response to CARB's charges and a meaningful opportunity to present that response at the hearing; as a result, we affirm the district court's decision.

## I. BACKGROUND

### A. Regulatory Framework

CARB, an entity within the Department of Defense ("DOD"), was created to insure the safety of military personnel who fly on private air carriers during military airlifts. Toward that end, CARB may suspend private air carriers operating under DOD contracts for, among other things, violations of FAA regulations, directives, orders, rules and standards; deficient compliance with accepted standards of "airmanship, training, and maintenance practices and procedures"; or "[a]ny other condition which affects the safe operation of [a] car-

rier's flights." 10 U.S.C. § 2640(c)–(d); 32 C.F.R. § 861.4(e).

CARB exercises its authority in two phases: "temporary nonuse" and suspension. Under its own regulations, CARB may place a carrier on temporary nonuse without prior notice, immediately barring it from participation in military airlifts. *Id.* at §§ 861.4(d)(2) & 861.4(h)(1). Temporary nonuse automatically ends in 30 days unless suspension proceedings are begun. *Id.* at § 861.6(h)(1)(iv). If CARB seeks to suspend a carrier, it must notify the carrier of that fact, state the basis of its concerns, and conduct a pre-suspension hearing under procedures that are "as informal as practicable, consistent with administrative due process." *Id.* at § 861.4(h)(2)(ii). At the hearing, the carrier's representatives may appear in person and offer evidence. *Id.* Although CARB need not present any evidence in support of its charges at the hearing, the carrier must rebut those charges by clear and convincing evidence. *Id.* at § 861.4(h)(2)(iv). If, after the hearing, CARB suspends the carrier, the carrier may file an administrative appeal with the Commander of the Military Traffic Management Command and the Commander in Chief of the Military Airlift Command, who rule on the matter jointly. *Id.* at § 861.4(j). If that appeal fails, a carrier may seek review in the district court under the Administrative Procedure Act. *See* 5 U.S.C. §§ 701–06.

## B. *Facts*

Reeve is a carrier that flies the skies over the Aleutian Islands off the coast of Alaska. For several years, Reeve has been under contract with the DOD to transport military personnel as part of the DOD's airlift program. Reeve's participation in that program brings it under CARB jurisdiction.

In July 1987, DOD inspectors, in the course of evaluating other carriers, came into contact with Reeve's Anchorage operations. Disturbed by what they observed, they recommended that a new inspection be conducted before awarding Reeve any further airlift contracts. Because the FAA planned to conduct a National Aviation Safety Inspection Program ("NASIP") review—a periodic assessment of a carrier's entire operation—of Reeve that coming September, DOD did not proceed further until the FAA team completed its work and issued its report. The NASIP report, released in early November 1987, contained an extensive and specific summary of problems in Reeve's operation. In 90 single-spaced pages, it spotlighted 384 alleged deficiencies in Reeve's operation. Twenty-eight of the 384 were assigned "Enforcement Investigation Report" ("EIR") numbers, meaning that they were sufficiently serious to raise enforcement issues. Subsequently, however, all but one of those 28 items were resolved between Reeve and the FAA without the imposition of any penalty; a $1000 fine was levied for the single remaining EIR violation.

On November 12, 1987, after the FAA's NASIP report had been released but before Reeve had reached agreement with the FAA on the EIRs, the DOD received a copy of the report and referred the matter to CARB for appropriate action. After reviewing the report, CARB, in accordance with its regulations, notified Reeve through a November 27, 1987 letter (the "Notification Letter") that it was placing the carrier on temporary nonuse and considering suspension. The Notification Letter specified that CARB's actions were based on "information provided in the FAA National Aviation Safety Inspection [NASIP] report" that "indicate[d] deficiencies that raise serious doubts about the training and company procedures of both the operations and maintenance departments plus the airworthiness of [Reeve's] aircraft." It also informed Reeve that it would schedule a meeting at which Reeve could present oral or written evidence "concerning [Reeve's] airworthiness and ability to safely perform airlift services for the DOD now or in the future." The Notification Letter also instructed Reeve to direct any questions to Colonel Dumbroski, the Director of the DOD's Air Carrier Survey and Analysis office, whose address and telephone number were provided. Finally, CARB attached to the Notification Letter a copy of

relevant DOD regulations outlining CARB's hearing procedures.

Reeve responded quickly to CARB's letter. It mailed in almost 200 pages of material to demonstrate, in its words, that "many large and small irregularities [identified in the NASIP report] have in fact been corrected." On December 10, 1987, Reeve also sent CARB two brief letters, advising CARB of "actions already taken as a result of our NASIP inspection" and highlighting Reeve's responses to certain aspects of the NASIP report. Specifically, Reeve asserted that all flight operations and mechanical deficiencies had been rectified and that specific plans were in place to address problems of maintenance training.

CARB convened a hearing on Reeve's suspension on December 14, 1987. Although Reeve had retained counsel, the company's president, Richard Reeve, was its sole representative at the hearing. Mr. Reeve chose to make only brief, general remarks to the assembled military officers (he had previously told CARB that his presentation would last no more than 90 seconds); he did not avail himself of the opportunity to present witnesses or introduce any additional documents addressing the allegations in the NASIP report. Following Mr. Reeve's presentation, CARB members, seeking to extract more specific responses to their safety concerns, peppered Mr. Reeve with questions for two hours before the hearing adjourned.

After considering Reeve's written submissions and the evidence adduced at the hearing, CARB suspended Reeve from participation in all military airlifts as of December 29, 1987. Its letter informing Reeve of the suspension said only that Reeve "still fail[ed] to comply with the applicable Federal Aviation Administration regulations, rules, and standards." Internal DOD appeals were subsequently denied. Three months later, Reeve successfully sought reinstatement, after on-site inspections confirmed that Reeve had taken action to fix the problems noted in the NASIP report.

In the meantime, however, Reeve filed a district court action claiming that CARB's suspension procedures violated due process. According to Reeve, the Notification Letter did not provide sufficient notice of the charges on which the proposed suspension would be based because the letter did not indicate which aspects of the NASIP report were the root of CARB's concerns. Additionally, Reeve claimed that CARB's hearing was inadequate because it did not provide Reeve an opportunity to confront adverse witnesses.

The district court rejected Reeve's constitutional claim. The court found that Reeve had received adequate notice because as a sophisticated air carrier it was able to identify which aspects of the NASIP report would most likely be of serious concern to CARB. The court further determined that CARB's hearing did not prejudice Reeve because Reeve had unlimited time to make its case in any manner it chose, including the presentation of witnesses on its own behalf. On appeal, this court declined to tackle the due process issue because we found that CARB's findings were too scant to allow judicial review of any kind. *See Reeve Aleutian Airways, Inc. v. United States,* 889 F.2d 1139, 1144–45 (D.C.Cir. 1989). We remanded for CARB to explain which FAA standards CARB found to have been violated, how CARB came to its determination to suspend Reeve, and what factors CARB found to be relevant to that determination. *See id.* at 1145.

In a June 22, 1990 letter to Reeve, CARB, through Major General William Sistrunk, its Chief of Staff and Presiding Member, issued detailed findings, illuminating the matters on which CARB had relied throughout its suspension proceedings. The Sistrunk letter emphasized that CARB's worries stemmed from the "magnitude, breadth, and safety impact of the ... deficiencies" uncovered in the NASIP report and that "the NASIP report is the fundamental basis of our concerns." The letter documented approximately 70 specific NASIP allegations that troubled CARB—and that Reeve did not adequately address in its submissions to CARB—but General Sistrunk specifically noted that

this list was "not exhaustive" of all CARB's concerns.

On its return to the district court, Reeve did not challenge CARB's supplemental findings as embodied in the Sistrunk letter. Instead, it reiterated its due process argument. The district court, relying on its prior reasoning, again found Reeve's constitutional claim unpersuasive and granted the government's motion for summary judgment. Reeve now appeals, squarely presenting the issue on which we previously reserved judgment: whether the notice and hearing provided to Reeve comported with due process.

## II. DISCUSSION

### A. Legal Framework

■ In due process analysis, we first determine whether constitutional safeguards apply at all, i.e., whether a private party has a property or liberty interest that triggers Fifth Amendment due process protection. See, e.g., Cleveland Bd. of Education v. Loudermill, 470 U.S. 532, 538–41, 105 S.Ct. 1487, 1491–93, 84 L.Ed.2d 494 (1985). If the party has a protected interest, we then decide "how much process is due." See id. at 541, 105 S.Ct. at 1493. Under Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), that determination is made by balancing three factors: the strength of the private interest affected by the proposed official action; the risk of mistaken deprivation of the private interest under current procedures and the likely value of additional safeguards; and, finally, the government's interest in avoiding additional procedures, including any financial or administrative burdens the added process would entail. See id. at 335, 96 S.Ct. at 903.

### B. Application to this Case

■ In Reeve's case, there is no real dispute at the first stage of the due process analysis: the government does not deny that some process is due because Reeve has a liberty interest in avoiding the damage to its reputation and business caused by a stigmatizing suspension. See Doe v. United States Dep't of Justice, 753 F.2d 1092, 1104–05 (D.C.Cir.1985); Conset Corp. v. Community Services Administration, 655 F.2d 1291, 1296–97 (D.C.Cir.1981). Accordingly, we proceed directly to the Mathews balance.

#### 1. Private Interest

We think it evident that CARB's actions deprived Reeve of a significant liberty interest. CARB's suspension imposed a sure stigma on Reeve; branding an airline unsafe creates a lasting blemish on a company's reputation, roughly the equivalent to Hawthorne's scarlet letter pinned across the heart of Hester Prynne. CARB's decision also had more immediate and tangible effects. The airline lost over $20,000 a day in military business and its civilian traffic dropped by half from the same period during the previous year. See also 889 F.2d at 1143 (noting that Reeve had demonstrated harm to its military and civilian traffic because of CARB's decision). CARB's suspension of Reeve, which (at least formally) did not affect Reeve's ability to obtain government work outside of the DOD and which ceased as soon as corrective actions were taken, did not amount to as severe a deprivation as the typical debarment ban on contracting for "virtually all government work" for a fixed period of time that we have met in prior cases. See Old Dominion Dairy Products, Inc. v. Secretary of Defense, 631 F.2d 953, 955–56 (D.C.Cir. 1980); Gonzalez v. Freeman, 334 F.2d 570, 578 (D.C.Cir.1964).[1] Realistically appraised, however, it had to work a significant deprivation of Reeve's constitutionally cognizable interest in avoiding the loss of government contracting opportunities based on stigmatizing charges.

---

**1.** In Arrow Air, Inc. v. United States, 649 F.Supp. 993 (D.D.C.1986), the district court distinguished a similar DOD suspension from Old Dominion Dairy on the grounds that a safety-related action was not based on "fraud, dishonesty, or lack of integrity." Id. at 999. We disagree. The allegation that an air carrier runs its business in a way that may endanger lives implicates the carrier's integrity and business reputation.

### 2. Risk of Error

Although Reeve's interest was significant, we conclude that, in the circumstances of this case, the alleged inadequacies of CARB's procedures that Reeve identifies—the lack of specificity of the notice and the burden placed upon them at the hearing—created only a minimal risk of erroneous deprivation of that interest.

#### a. Notice

■ The notice arguments made in Reeve's briefs seem to rely on two different premises. At some points, Reeve appears to assert that it was only a subset of the NASIP report—specifically, the items later identified in General Sistrunk's letter—that truly concerned CARB. From that assumption, Reeve argues that CARB's Notification Letter was inadequate because it did not say which portions of the NASIP report formed the basis for CARB's actions: essentially, CARB required Reeve to look for the proverbial needle in the haystack. *See* Appellant's Brief at 27 (characterizing CARB's attitude as "we know what we're interested in—but we won't tell you"). The record, however, reveals that the entire NASIP report—the whole haystack—was of interest to CARB. General Sistrunk's letter, the authoritative statement of CARB's findings,[2] says that CARB's concerns arose from the "magnitude, breadth, and safety impact of the ... deficiencies" uncovered in the NASIP report and that "the NASIP report is the fundamental basis of our concerns." Further, preceding his specific discussion of the 70 items—a discussion on which Reeve places great weight—General Sistrunk cautions that these were only areas of "particular concern," not an exhaustive list of *all* CARB's concerns. Thus, Reeve's first notice argument is untenable; the NASIP report was the source of CARB's apprehension, and the Notification Letter told Reeve that in no uncertain terms: it said that

CARB's actions were based on the "information provided in the FAA National Aviation Safety Inspection [NASIP] report."[3]

We are therefore left with the second, more limited, argument Reeve appears to make in its briefs: that it was unable to marshall a proper defense because CARB did not notify Reeve which NASIP items were of *particular* concern to it. *See* Reply Brief at 6 (arguing that CARB did not specify which charges "were critical and which were not"). We now assess that claim.

Due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). Obviously, when a notice requires its target to guess among several possible bases for adverse government action, it has not served those fundamental purposes. Thus, in *Gray Panthers v. Schweiker*, 652 F.2d 146 (D.C.Cir.1980) ("*Gray Panthers I*"), we found a notice's failure to specify which of two possible reasons—unnecessary treatment or unreasonable medical charges—motivated denial of Medicare benefits precluded a meaningful response and so created a significant risk of an erroneous deprivation. *See id.* at 167–69. But here Reeve was told explicitly what the dispute was about, although perhaps not what factors weighed most heavily on CARB's collective mind. At most, the absence of knowledge about this second level of CARB concern may have prevented Reeve from knowing where to concentrate its fire.

But even the possibility of misguided fire was negligible in this case. It is axiomatic that we evaluate the adequacy of process in light of "the capacities and circumstances of those who are to be heard."

---

**2.** It is worth reiterating that Reeve does not directly challenge CARB's supplemental findings as embodied in the Sistrunk letter.

**3.** The letter also referred to the fact that the NASIP report indicated "deficiencies that raise serious doubts about the training and company

procedures of both the operations and maintenance departments plus the airworthiness of [Reeve's] aircraft." As Reeve's counsel acknowledged at oral argument, those areas encompass *all* the charges specified in the FAA report.

*Goldberg v. Kelly,* 397 U.S. 254, 268–69, 90 S.Ct. 1011, 1020–21, 25 L.Ed.2d 287 (1970); *Gray Panthers I,* 652 F.2d at 166 (whether a procedure satisfies due process is determined "with reference to the characteristics of the group who have to use it"). Reeve was an experienced, regulated air carrier that was presumably familiar with FAA reports and was represented by counsel. Accordingly, Reeve—unlike aged Medicare recipients whom we found less likely than most to "deal effectively with legal notices," *see id.* at 169—could be expected to have sufficient know-how to separate the wheat from the chaff in the NASIP report—to assess which charges contributed most heavily to CARB's overall evaluation of Reeve's safety.[4]

Moreover, in concluding that the actual notice was adequate to avoid serious risk of erroneous deprivation, we also take into account the Notification Letter's offer of follow-up contact through which Reeve could request additional information.[5] *Cf. Gray Panthers I,* 652 F.2d at 169 (noting that imprecise initial notice can be supplemented by ability to "flesh out the notice" through informal consultation with either the initial or reviewing decisionmaker). CARB's Notification Letter specified that *any* questions could be addressed to Colonel Dumbroski, an adviser to CARB and head of the Air Carrier Survey and Analysis Office. Thus, unlike *Gray Panthers I,* where there was no assurance of the right to speak to anyone knowledgeable about a particular case, *see id.* at 169 n. 50, here the government provided the name of a person in authority for Reeve to contact to seek any additional specification it thought necessary.[6]

Our confidence in the adequacy of CARB's notice is bolstered by Reeve's own actions (and inaction). Reeve's contemporaneous behavior belies its assertion that the notice employed here left it shadowboxing with CARB, unaware of the matters in dispute and thus unable to mount a meaningful defense. Reeve sent reams of documents to CARB to address the allegations in the NASIP report. Furthermore, Reeve specifically responded to NASIP items relating to flight operations, mechanical deficiencies, and maintenance, areas that obviously are central to safety, and that were later highlighted in CARB's remand letter.[7] Moreover, although Reeve communicated with Colonel Dumbroski by phone and mail, Reeve never formally requested any specification of CARB's primary concerns or voiced confusion as to any other aspect of the proceedings.[8] *See* 889 F.2d at 1141

---

**4.** At oral argument, Reeve's counsel asserted that the fact that the items later singled out in the Sistrunk letter did not include all of the 28 EIRs cited by the FAA demonstrated that sophistication was not helpful in divining what would be of most interest to CARB. Reeve has never provided evidence of the precise extent of this interagency discrepancy. The government, on the other hand, has provided specific examples of overlap between the FAA's EIRs and General Sistrunk's list. *See* Appellees' Brief at 46. Thus, we have no basis to conclude that the discrepancy, even if relevant, was substantial. *See also* Sistrunk Letter at 5 (noting that the EIRs "serve to highlight the most serious concerns evidenced by the [NASIP] report").

**5.** Reeve argues that " 'written notice that needs supplementation through action by the recipient does not satisfy due process.' " Reply Brief at 13 (quoting *Gray Panthers v. Schweiker,* 716 F.2d 23, 32 (D.C.Cir.1983) ("*Gray Panthers II*")). The quoted language, however, is not a holding in *Gray Panthers II* but a parenthetical summarizing *Vargas v. Trainor,* 508 U.S. 485 (7th Cir. 1974), *cert. denied,* 420 U.S. 1008, 95 S.Ct. 1454,

43 L.Ed.2d 767 (1975). *Vargas* itself is easily distinguishable. There, the Seventh Circuit said only that notice was insufficient where welfare recipients—who were often "aged, blind or disabled" individuals—were given essentially no reasons at all for adverse government action and could obtain an explanation only by contacting a caseworker. *See id.* at 487, 489.

**6.** Although *Gray Panthers I* referred to the opportunity to discuss issues with a decisionmaker, that case certainly does not hold that an opportunity to discuss issues with knowledgeable staffers is irrelevant to due process analysis.

**7.** In fact, the Sistrunk letter states that Reeve addressed *all* the issues of preeminent concern to CARB, although not sufficiently to regain CARB's confidence in Reeve's safety at that time.

**8.** Reeve refers to a few statements in one of its December 10 letters to CARB to demonstrate that it did request a more definite statement of charges. After asserting that all "flight opera-

("Reeve did not object to the procedures ... nor did it claim a lack of understanding of the nature of the questions raised or charges brought by CARB."); *see also* Sistrunk Letter at 2 (Reeve "did not indicate at any time that it desired any further time to prepare for the hearing or that it needed additional representation or further explanation of our process").

**b. The Hearing**

■ Reeve alleges that CARB's hearing did not provide it with a meaningful opportunity to respond to the NASIP charges because CARB was not required to present any witnesses—including the FAA inspectors who drafted the NASIP report—or other evidence to support its charges, thus depriving Reeve of the opportunity to confront its accusers. But Reeve had a detailed, specific statement of the evidence against it—the NASIP report—in its possession months before the hearing took place. For all that appears, Reeve could have sought to counter that evidence through an oral or written presentation of whatever type or length it thought best, including calling FAA or CARB investigators—its accusers—to testify and quizzing them on their qualifications, the specific factual allegations in the NASIP report, or any other matters that might affect the credibility of their findings. Reeve also had the chance to engage in direct discussion of disputed issues with the ultimate decisionmakers, allowing it to focus its responses to issues of most concern to CARB and to clear up any ambiguities in the paper record. *See Goldberg*, 397 U.S. at 269, 90 S.Ct. at 1021 (noting that written submissions, unlike oral hearings, "do not permit the recipient to mold his argument to the issues the decision maker appears to regard as important"); *Gray Panthers I*, 652 F.2d at 162 ("Ambiguities which are not readily apparent on the face of a document can be disclosed and clarified with a few moments of oral exchange between the individual and the decisionmaker."). We have found the opportunity for such oral rebuttal sufficient to protect against erroneous deprivation in similar circumstances in the past, and see no reason to diverge from that path today to achieve the marginal gains arguably associated with a more formal process. *See Horne Brothers, Inc. v. Laird*, 463 F.2d 1268, 1271 (D.C.Cir.1972) (for suspension lasting more than a year, fairness requires specific notice of some charges against contractor and an opportunity to rebut those charges); *see also Conset Corp. v. Community Services Administration*, 655 F.2d 1291, 1296–97 & n. 10 (D.C.Cir.1981) (company denied government contracts but not formally suspended because of allegations of conflicts of interest "[s]urely" not entitled to formal hearing); *Transco Security, Inc. v. Freeman*, 639 F.2d 318, 322–23 (6th Cir.) (suspended contractor given adequate process when given opportunity to present information or argument in person or in writing because such an opportunity coupled with proper notice "will timely cure such errors as suspending the wrong contractor or suspending a contractor based on mere suspicion, unfounded allegation, or error"), *cert. denied*, 454 U.S. 820, 102 S.Ct. 101, 70 L.Ed.2d 90 (1981); *cf. Gonzalez v. Freeman*, 334 F.2d 570, 578 (D.C.Cir.1964) (for *five year* debarment, must have opportunity to present evidence and cross-examine adverse witnesses).

**3. The Government's Interest**

■ Turning to the final factor in the *Mathews* balance, *i.e.*, the government's in-

tions" deficiencies had been rectified, Reeve's letter states: "If it looks different to you, by all means, tell me." The most reasonable reading of that statement, however, is not that Reeve was uncertain whether some or all "flight operations" deficiencies were on CARB's mind, but that it was uncertain whether Reeve's response was sufficient to allay all CARB's concerns in that area.

In the following paragraph of the letter, after detailing specific steps it was taking to remedy maintenance training problems, Reeve states: "There may be other areas of concern to the Board and we certainly entertain your comments." While that statement might reflect some concern with identifying any residual worries of CARB, taken in context it sounds more like a pro forma offer of cooperation. In any case, it is not the direct, explicit request for a more definite statement that one would expect of a company at sea as to the nature of the charges against it.

terest, we think it sufficient to note that additional procedures prior to suspension would inevitably add administrative and financial burdens on the government's side. To satisfy Reeve's criticism of the notice provided by CARB, its members would have to expend resources to classify formally the safety issues raised in the NASIP report in terms of importance. *Cf. Mathews*, 424 U.S. at 348, 96 S.Ct. at 909 (noting that additional procedure will take away from other agency functions "since resources available for any particular program ... are not unlimited"); *Old Dominion Dairy*, 631 F.2d at 955 ("We are mindful of the fact that Government agencies require sufficient latitude to ensure the efficient functioning of agency operations...."). And the full evidentiary hearing Reeve seeks would be extraordinarily burdensome and costly to CARB. *See, e.g., Gray Panthers I*, 652 F.2d at 172; *see also Mathews*, 424 U.S. at 348, 96 S.Ct. at 909 ("The judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decisionmaking in all circumstances."). Of course, if the other factors in the *Mathews* balance were stronger, the government interest in avoiding the accoutrements of fuller notice and hearing might be outweighed, but in this case the other factors are not sufficiently weighty.

4. Striking the Balance

■ Although we find that Reeve has a significant interest in avoiding the deprivation of reputational and economic interests caused by even a temporary suspension, we also conclude that in this case the government has lived up to its constitutional obligation to protect those interests. *See Horne Brothers, Inc. v. Laird*, 463 F.2d 1268, 1271 (D.C.Cir.1972) (where party was suspended from government contracting for more than a year, it must receive specific notice "as to at least some charges alleged against him"); *supra* page 601 (noting that opportunity to rebut charges at an oral hearing has been found sufficient even when greater interests of government contractors than those involved here were implicated). CARB has provided specific notice, a detailed statement of the evidence, and an opportunity to seek clarification of any confusion caused by the notice. Moreover, Reeve cites nothing to suggest why it could not make any affirmative or responsive presentation it desired—including presumably, calling FAA or CARB inspectors and interrogating them as to the basis for their determinations. Those procedural rights together with the right to an administrative appeal provided adequate safeguards against the erroneous deprivation of Reeve's interests. Consistent with our prior cases, we find that the additional administrative and financial burdens of other procedures are not constitutionally required.

III. CONCLUSION

Under the utilitarian balance prescribed by the Supreme Court in *Mathews v. Eldridge*, Reeve has received at least the quantum of process it was due before being suspended from the military airlift transportation program. The judgment of the district court is therefore

*Affirmed.*