**Burt K. FISCHER, et al., Appellants,**

v.

**RESOLUTION TRUST CORPORATION, Appellee.**

No. 94–5354.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 12, 1995.

Decided July 18, 1995.

James L. Feldesman, Washington, DC, argued the cause for appellants. With him on the briefs were Eugene R. Fidell, Edward T. Waters and Melissa M. Thomson, Washington, DC.

Robert P. Reznick, Washington, DC, argued the cause for appellee. With him on the brief were Lawrence F. Bates, Robert B. Funkhouser, Frederick A. Douglas and Nicholas S. Penn, Washington, DC.

Before: WALD, SILBERMAN, and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

The district court rejected appellants' claim against the Resolution Trust Corporation based on statutory provisions precluding judicial review. We affirm.

## I.

The RTC, created in 1989 by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), is charged with the

temporary task of liquidating the assets of the large number of depository institutions that failed in the 1980s. FIRREA directs the RTC to promulgate regulations "establishing procedures for ensuring that any individual who is performing, directly or indirectly, any function or service on behalf of the Corporation meets minimum standards of competence, experience, integrity, and fitness." 12 U.S.C. § 1441a(n)(6)(A) (West Supp.1995). The RTC is also required to prohibit "any person who does not meet the minimum standards" from "entering into any contract" with it, *id.* § 1441a(n)(6)(B)(i).

The RTC issued regulations in 1990 providing, *inter alia,* that before entering into any contract, the Corporation must determine that no "organizational conflict of interest" exists between itself and the contracting private entity, or, that "if such conflict exists, it has been waived" by a designated RTC committee. 12 C.F.R. § 1606.6(c) (1995). The term "organizational conflict of interest" includes "situation[s] in which ... [t]he contractor or any related entity has an interest or relationship which could adversely affect the contractor's ability to perform under the contract or to represent the RTC." *Id.* § 1606.2(j)(2). The Corporation subsequently adopted a "litigation policy" which indicates that a conflict of interest can be created if a would-be contractor is a defendant in a lawsuit with the RTC or the FDIC. *See 1992 Litigation Policy,* 57 Fed.Reg. 32,839 (1992). The policy sets forth a list of factors upon which the RTC relies in determining whether to continue to do business with such a contractor, including the number of lawsuits; the numbers of individuals charged and their job responsibilities; whether the contractor is accused of intentional wrongdoing, gross negligence, or mere negligence; and the size of the damages claimed. *Id.* at 32,840. On November 10, 1993, the RTC amended the litigation policy to specify that the Corporation may apply the guidelines to determine that a firm has an organizational conflict of interest once the RTC's Executive Committee has granted authority to sue a contractor, even if the suit has not yet been filed. *See 1993 Litigation Policy,* 58 Fed. Reg. 61,933 (1993).

Appellants, a class consisting of the partners of the Grant Thornton accounting firm (collectively referred to as "appellant" or "Grant Thornton"), had been tentatively awarded a Task Order to perform services for a RTC settlement/workout team in the RTC's Atlanta office. Before officially awarding the project, the RTC directed the firm to submit additional information, including certifications detailing any organizational conflicts of interest under 12 C.F.R. § 1606.6(a). On November 19, 1993, Grant Thornton was notified by the RTC's Office of Ethics that the firm was deemed to have an "organizational conflict of interest" due to the RTC's plan to file a lawsuit seeking $280 million in damages from Grant Thornton because of its role in the failure of the San Jacinto Savings Association. The suit, when subsequently filed, alleged that Grant Thornton negligently performed audits and misrepresented San Jacinto's financial situation, thereby assisting the bank to continue to operate while insolvent and exposing taxpayers to significant liabilities.

In its letter of November 19 to Grant Thornton, the RTC invited the firm to seek a waiver of the conflict, and informed it that unless such waiver was granted on any contract sought, the firm could not be certified to contract with the RTC on the Task Order in question "or any other transaction." Rather than seek a waiver, Grant Thornton sought an injunction ordering the RTC to award the Task Order to Grant Thornton and requiring that the RTC suspend or rescind awards of all other contracts upon which Grant Thornton had outstanding bids. The district court denied Grant Thornton's request on jurisdictional grounds, relying on two provisions of FIRREA which, in the district court's view, precluded judicial review of the RTC's decision. The first of these, 12 U.S.C. § 1441a(n)(6)(D), provides that

> [n]o offer submitted to the Corporation may be accepted unless the offeror agrees that no person will be employed, directly or indirectly, by the offeror under any contract with the Corporation unless all applicable information described in subparagraph (C) with respect to any such person is submitted to the Corporation and the

Corporation does not disapprove of the direct or indirect employment of such person. *Any decision made by the Corporation pursuant to this paragraph shall be in its sole discretion and shall not be subject to review.*

*Id.* (emphasis added). The second jurisdictional limitation is 12 U.S.C. § 1821(j), FIR-REA's "anti-injunction" provision, which states that "[e]xcept as provided in this section, no court may take any action ... to restrain or affect the exercise of powers or functions of the Corporation as a conservator or receiver." *See Fischer v. RTC*, No. 93–2548 (D.D.C. Feb. 4, 1994). Grant Thornton appeals.[1]

## II.

Grant Thornton contends that it has been "debarred" from government contracting without due process guaranteed by the Fifth Amendment, and that the RTC's 1993 litigation policy is invalid in two other respects. Appellant maintains that issuance of the policy violated the statute's command that the RTC promulgate "rules and regulations" (but not policy statements) "governing conflicts of interest" under 12 U.S.C. § 1441a(n)(3). And, appellant argues that the policy fails to satisfy FIRREA's requirement that "overall strategies, policies ... procedures, guidelines, and statements" be promulgated pursuant to the Administrative Procedure Act (*i.e.*, with notice and comment). 12 U.S.C. § 1441a(b)(11)(B)(iii). Although the RTC's conflict of interest regulations were promulgated in accordance with APA procedures, the policy statement interpreting the regulations was not. Appellant also claims that the Corporation misapplies its own regulation, which defines an organizational conflict of interest as a "situation in which ... [t]he contractor or any related entity has an interest or relationship which could adversely affect the contractor's ability to perform under the contract or to represent the RTC," 12 C.F.R. § 1606.2(j)(2), by interpreting it to include the RTC's lawsuit against Grant Thornton even though that lawsuit might not

actually interfere with appellant's "ability" to perform the contract.

The RTC responds to all of appellant's arguments, but primarily relies on its jurisdictional defense—that judicial review of the RTC's conflict of interest determination is precluded by 12 U.S.C. § 1441a(n)(6)(D), and that in any event the court may not order an injunction under 12 U.S.C. § 1821(j). The latter section has been held not to apply to actions taken by the RTC in its corporate capacity, as opposed to when it acts as a "conservator or receiver," *see Rosa v. Resolution Trust Corp.*, 938 F.2d 383, 397 (3d Cir.), *cert. denied*, 502 U.S. 981, 112 S.Ct. 582, 116 L.Ed.2d 608 (1991); *cf. National Trust for Historic Preservation v. FDIC*, 995 F.2d 238, 240 & n. 2 (D.C.Cir.1993), and the parties vigorously dispute the proper designation of the RTC's activities here. We find it unnecessary to resolve that debate, however, because we conclude that judicial review is independently precluded altogether under § 1441a(n)(6)(D).

Appellant seeks to escape the impact of § 1441a(n)(6)(D) through two approaches. It claims that, as a matter of statutory interpretation, Congress did not intend § 1441a(n)(6)(D) to have the reach that the RTC ascribes to it. And, it argues that even if the section applies to this cause of action *in hoc verba*, it may not be held to preclude Grant Thornton's constitutional claim.

First to the statute. Grant Thornton contends that while § 1441a(n)(6)(D) bars judicial review of "[a]ny decision made ... pursuant to this paragraph" (referring to paragraph a(n)(6)), including determinations that any individual performing services for the Corporation "meets minimum standards of competence, experience, integrity, and fitness," another section of the statute, § 1441a(n)(3), specifically refers to "conflicts of interest" and contains no preclusion of review. Section 1441a(n)(3), entitled "use of confidential information," provides that

1. The RTC filed a second lawsuit against Grant Thornton four days after the firm filed its complaint for injunctive relief, in which the RTC sought approximately $70 million in damages for

negligence and breaches of contract regarding the performance of audits of Valley Federal Savings Bank.

The Thrift Depositor Protection Oversight Board and the Corporation shall, not later than 180 days after August 9, 1989, promulgate rules and regulations applicable to independent contractors governing conflicts of interest, ethical responsibilities, and the use of confidential information consistent with the goals and purposes of Titles 18 and 41.

12 U.S.C. § 1441a(n)(3). According to appellant, the action taken by the RTC in this case, a determination made pursuant to the regulations and policy statements governing "organizational conflicts of interest," necessarily falls under § 1441a(n)(3), not § 1441a(n)(6), and is therefore not insulated from judicial review.

We think that is a labored and unnatural construction of the statute. Section 1441a(n)(6) is entitled "disapproval of contractors," and its detailed provisions [2] make clear that Congress meant to cloak from judicial review the entire regulatory scheme—including any regulations promulgated under subparagraph A, prohibitions from service under subparagraph B, or individual decisions under subparagraph D—by which the RTC determines that a contractor fails to satisfy "minimum standards of competence, experience, integrity and fitness." Under its regulations, the RTC may determine that a would-be contractor has an "organizational conflict of interest" where such a contractor has "an interest or relationship which could adversely affect [its] ability to ... represent the RTC." It is self-evident, we think, that a lawsuit *alleging* that a firm's negligence resulted in a multimillion-dollar loss to taxpayers may be deemed to create such a conflict, and therefore the RTC legitimately questions whether the firm is fit under § 1441a(n)(6) to perform the contract.

Thus, the RTC's "organizational conflict of interest" determination falls squarely within the provisions of § 1441a(n)(6), and judicial review is precluded by § 1441a(n)(6)(D).

Moreover, we think that § 1441a(n)(3), entitled "use of confidential information," is, as the RTC argues, directed at the ongoing ethical responsibilities of a contractor who has *already* been awarded a contract, and is thus inapplicable here. It is true, as appellant points out, that the words "conflicts of interest" appear in § 1441a(n)(3). But the statute does not define the term "conflicts of interest," and we think it fatuous to suggest that the use of those words in another part of the statute with a different purpose prevents the RTC from employing an "organizational conflict of interest" designation, defined by regulation, as part of its procedure for the "disapproval of contractors" under § 1441a(n)(6).

■ Appellant also contends—and this argument seems even more artificial—that § 1441a(n)(6)(D) does not apply to this case because the RTC's action was taken against a *firm*, while § 1441a(n)(6)(D) refers to "persons" and § 1441a(n)(6)(A) refers to "individuals." It is implausible that Congress meant to draw the distinction appellant proposes, since it would only be necessary for the RTC to list all the individuals in Grant Thornton to bring its decision within the preclusion of review in § 1441a(n)(6)(D). Nor can we imagine any reason why Congress would have wished the scope of § 1441a(n)(6)(D)'s preclusion to turn on whether it is an individual or a corporation (or partnership) that is disapproved. After all, the paragraph is entitled "disapproval of contractors," and § 1441a(n)(6)(D) speaks to the ethical re-

2. The other relevant provisions of the paragraph, entitled "Disapproval of Contractors," state as follows:

(A) In general
 The Thrift Depositor Protection Oversight Board shall prescribe regulations establishing procedures for ensuring that any individual who is performing, directly or indirectly, any function or service on behalf of the Corporation meets minimum standards of competence, experience, integrity, and fitness.
(B) Prohibition from service on behalf of Corporation

The procedures established under subparagraph (A) shall provide that the Corporation shall prohibit any person who does not meet the minimum standards of competence, experience, integrity, and fitness from—
 (i) entering into any contract with the Corporation; or
 (ii) being employed by the Corporation or any persons performing any service for or on behalf of the Corporation.
12 U.S.C. § 1441a(n)(6)(A) & (B).

sponsibilities of "offerors" for their individual employees. We conclude that § 1441a(n)(6) refers to all contractors—whatever their form.

■ Grant Thornton's second approach for avoiding § 1441a(n)(6)(D) requires us to ponder its substantive claim more closely. It will be recalled that appellant has asserted a due process argument, and neither the Supreme Court nor this court has ever held that Congress may constitutionally preclude judicial review of a constitutional claim.[3] Indeed, the Supreme Court has often strained to construe legislation restricting judicial review so as to avoid deciding this issue. *See, e.g., Webster v. Doe,* 486 U.S. 592, 603–04, 108 S.Ct. 2047, 2053–54, 100 L.Ed.2d 632 (1988); *Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 681 n. 12, 106 S.Ct. 2133, 2141 n. 12, 90 L.Ed.2d 623 (1986); *cf. Weinberger v. Salfi,* 422 U.S. 749, 762, 95 S.Ct. 2457, 2465, 45 L.Ed.2d 522 (1975). If, however, we determine that appellant's constitutional claim is insubstantial, *see Hagans v. Lavine,* 415 U.S. 528, 537, 94 S.Ct. 1372, 1379, 39 L.Ed.2d 577 (1974), we can give § 1441a(n)(6)(D) its apparent meaning without confronting this difficult unresolved issue of constitutional law.

Appellant's due process claim is premised on the notion that it has suffered a blow to a protected "liberty" interest, which, of course, triggers an inquiry as to whether the process it has been afforded is adequate. *Reeve Aleutian Airways, Inc. v. United States,* 982 F.2d 594, 598 (D.C.Cir.1993), citing *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538–41, 105 S.Ct. 1487, 1491–93, 84 L.Ed.2d 494 (1985). Grant Thornton argues that the RTC's "organizational conflict of interest"

designation is functionally equivalent to a classic government debarment, which, we have held, implicates a liberty interest. Debarment is a form of punishment which stigmatizes the target. *See Old Dominion Dairy Products, Inc. v. Secretary of Defense,* 631 F.2d 953, 962–63 (D.C.Cir.1980).

Appellant recognizes that it may seek a waiver of the conflict of interest determination, so that disqualification as a bidder on any specific government contract—let alone all contracts—has not yet attached. But appellant maintains that it has been "debarred" as a practical matter because if it wished to prepare a bid, it would have to expend considerable resources without knowing whether a waiver would be granted and is thus subject to a prohibitive disincentive. Moreover, appellant asserts that a waiver request would be futile, relying on statements made by the RTC in a separate waiver proceeding involving a former Grant Thornton partner.[4]

In determining whether Grant Thornton's liberty interest has been affected by the RTC's actions here, the practicalities of its ability to prepare a bid and secure a waiver are not particularly relevant. The first issue for us is whether Grant Thornton has been stigmatized by the RTC's preliminary decision that the firm has a conflict of interest. We think not. We agree with the RTC that any stigma that attached to Grant Thornton derived from the lawsuit which the RTC filed against the firm, and not from the RTC's recognition of the conflict in its "organizational conflict of interest" designation. The firm will have the opportunity, of course, to defend itself in court against the charges of negligence. But for the RTC to decline to retain an accounting firm to represent it in a workout or to perform services for the work-

---

3. *See, e.g., Ayuda, Inc. v. Thornburgh,* 948 F.2d 742, 758 n. 12 (D.C.Cir.1991) ("To be sure, elimination of judicial review over constitutional claims presents a serious constitutional question and the presumption [in favor of review of administrative action] in that context may therefore be more difficult to overcome.") (emphasis in original) (citations omitted); *cf. Webster v. Doe,* 486 U.S. 592, 603, 108 S.Ct. 2047, 2053–54, 100 L.Ed.2d 632 (1988) (Congress must clearly express intent to preclude judicial review of constitutional challenges); *Suzal v. Director, United States Info. Agency,* 32 F.3d 574, 586 (D.C.Cir. 1994).

4. In the other proceeding, the RTC *granted* a waiver to MMC Joint Venture, an entity of which a former Grant Thornton partner, Larry A. Jobe, was a part-owner and manager. As a condition of the waiver, the RTC required that Jobe, (who was a defendant along with Grant Thornton in the San Jacinto litigation), be removed from the Executive and Management Committees of MMC, and be screened from work on MMC's RTC contracts until the San Jacinto litigation issues were resolved.

out agent while it is litigating against that firm is not a punishment inflicted on the firm; it is simply a recognition that it is hazardous to retain an accountant (or a lawyer) to represent you if his interests are in conflict with your own. It is hard to imagine a more palpable conflict of interest than that arising from the relationship between warring litigants.

To be sure, there is a statement in the litigation policy that the existence of the lawsuit "may create a presumption that the firm has engaged in widespread or systematic fraud or negligence ... or has otherwise substantially contributed to banking and/or thrift problems," 57 Fed.Reg. at 32,840. In another context, this might be thought to carry an *independent* stigmatizing effect. Not in this context, however. The RTC is itself suing Grant Thornton, alleging systematic negligence. It is hardly open to the RTC to ignore its own allegations. It would be another matter entirely if Grant Thornton had been sued by a third party, and based on that suit, the RTC had declared that Grant Thornton was disqualified from bidding on a RTC contract.

 The dominant role of the RTC's underlying lawsuit against Grant Thornton in this proceeding is further illustrated by appellant's description of the process which it believes is its "due." In its brief, it asks for no less than "the opportunity to address the merits of the collateral lawsuits, to present evidence, and cross-examine witnesses before Office of Ethics personnel charged with evaluating whether the RTC will continue to contract with Grant Thornton." In other words, appellant asserts the right to turn the tables on the RTC's counsel at a time of its choosing, and to, in effect, put the RTC's lawsuit on trial before RTC ethics personnel. Perhaps sensing that this position runs afoul of this circuit's chutzpah doctrine, *see Harbor Ins. Co. v. Schnabel Found. Co.*, 946 F.2d 930, 937 n. 5 (D.C.Cir.1991), *cert. denied*, 504 U.S. 931, 112 S.Ct. 1996, 118 L.Ed.2d 592 (1992); *cf. Northwest Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 808 F.2d 76, 83 (D.C.Cir.1987), in its reply brief and at oral argument, Grant Thornton retreated to the claim that it should be entitled to show that the whole firm—and particularly the partners in this litigation—should not be tarred with the negligence lawsuit brush. Even if we thought Grant Thornton has suffered an injury to a protected liberty interest (which we do not), we would be unimpressed by this modified claim for more process since it asks only for that which the waiver procedure provides.[5] We are unwilling to assume, before the agency has had the opportunity to make a final determination, that seeking a waiver would be futile simply because of the RTC's decision in a prior case involving an ex-Grant Thornton partner (*see supra* n. 4).[6]

---

**5.** Once the Corporation determines that an "organizational conflict of interest" exists between itself and the contracting private entity, the Corporation may not enter into a contract with that entity unless a waiver is granted. 12 C.F.R. § 1606.6(c). The contractor is required to provide information

(i) Detailing those conflicts;

(ii) Requesting a waiver from the Contractors' Conflicts Committee or the Outside Counsels' Conflicts Committee; and

(iii) Including with the request any information it deems appropriate to support the issuance of a waiver.

*Id.* § 1606.6(b)(3). In seeking a waiver, a contractor would presumably deem it "appropriate" to include any information tending to mitigate the effect of the organizational conflict of interest, based on the list of enumerated factors in the RTC's litigation policy. Thus, for example, the firm might seek to show why, on the facts of the lawsuit, accusations of "home-office" wrongdoing should not raise "a legitimate concern of inherent or institutional misfeasance or malfea-

sance." *See 1992 Litigation Policy*, 57 Fed.Reg. at 32,840.

**6.** In this connection, even if the statute did not preclude judicial review, we would determine that appellant's failure to seek a waiver renders its claim unripe. Ripeness doctrine is designed to protect "the agency's interest in crystallizing its policy before that policy is subject to judicial review and the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting," *Eagle–Picher Indus., Inc. v. EPA*, 759 F.2d 905, 915 (D.C.Cir.1985) (citations omitted). *See City of Houston v. Department of Hous. & Urban Dev.*, 24 F.3d 1421, 1430–31 (D.C.Cir.1994). *See also FTC v. Standard Oil Co.*, 449 U.S. 232, 241, 101 S.Ct. 488, 493–94, 66 L.Ed.2d 416 (1980) (dismissing as unripe a challenge to the FTC's issuance of a complaint, deemed not a "definitive statement of position," but only a "threshold determination that further inquiry is warranted"). Because Grant Thornton did not seek a waiver, the agency has rendered no "final" decision on the firm's eligibility for a

Nor do the practical difficulties that Grant Thornton perceives in pursuing the waiver and the contract simultaneously appear to us to be particularly daunting. A contractor is always obliged to incur costs in preparing a bid, without assurance of winning.

In sum, we believe that appellant's constitutional claim is insubstantial, and therefore we need not confront the troublesome reserved issue. We give § 1441a(n)(6)(D) its natural meaning and hold that appellant's entire claim is barred, as the federal courts lack jurisdiction to entertain it.

particular contract, and thus appellant's claims are untimely.